Thank you, Your Honor. May it please the Court, my name is Sandy Svetkov from San Francisco. I represent the appellant, Mr. Musladin. I'd like to reserve five minutes of my 20 for rebuttal. Mr. Musladin appeals the denial of the writ of habeas corpus by the District Court, and while we briefed several issues, I'd like to emphasize two errors that, in our view, either separately or in combination, were substantially prejudicial to the verdict of first-degree murder, which, as you know, requires both premeditation and expressed malice. The first argument or the first issue would be the deprivation of counsel at a critical stage of re-instructing the jury, and in that connection, I've advised counsel this morning that I would rely on this Court's decision earlier this week in France v. Haisley, which speaks to the re-instruction question, and he was familiar with it. The second — That's more than I can say. Well, I'll discuss it when we get to that issue. The second question that I'd like to address is the argument of ineffective assistance of counsel in counsel's failure to request a state-of-mind limiting instruction on the hearsay from a three-year-old child whose testimony had been excluded pretrial because it was incompetent. And I'd like to begin with the second question because I think it sets the stage for how the first-degree murder verdict is affected. The trial court allowed a biased witness, the estranged wife's brother, to testify about what the child said to him. The trial court said that the door was open. And the lawyer objected to that, right? Well, no. We didn't object the first time. We objected when it came back on cross. He tried to object on redirect, Your Honor. Right. But the judge said, you open the door. And the door was open because Mr. Albaugh said he's got a gun before the gun was drawn from underneath the seat of the car. So to show the witness's state of mind the state courts have held, the trial court correctly allowed the witness to testify how he knew the gun was there before it was pulled out. And he said that Garrick, the three-year-old son, told him about the gun. It got worse on redirect because the prosecutor went back to it on redirect. And when, as Your Honor pointed out, the defense counsel tried to object, the judge said, you open the door. And then the door opened even further. The door said, Garrick told me he had a gun and he told me he intended to kill Tom, the murder victim, with a gun. Well, the door wasn't open to that. But I don't think that ruling is preserved under the Certificate of Appealability. So we have, or predecessor counsel, preserved, both in the district court habeas proceeding and on appeal, the argument that having opened that door and let all that stuff in, the major and what turned out to be the key evidence on both express malice and premeditation. Well, it really wasn't so key. I mean, if you look at the prosecutor's closing argument, he mentions it for about a page out of maybe 70 or 80. And most of what he's talking about is the physical evidence. And he also has other evidence of premeditation. But mainly he's talking about physical evidence. And mainly he's saying the guy, that Ms. Lund's whole story is a lie. And the converse of the lie is that he, not necessarily before he got there, but at some point intended to kill the guy. You know, Your Honor, all of that is true. But the child provides direct evidence. The rest is indirect. The rest is circumstantial. And you can put that together. And the question is injury to the verdict. And I submit to Your Honor that when you pull evidence from a three-year-old child and put it in the hands of a biased witness, we don't even know if the child actually said that. It's hearsay. But it's the child saying the defendant intended to kill Tom. And that's the key direct evidence of premeditation and express malice. Let me tell you, I mean, I do think the whole ruling seems totally wrong and should never have come in. But the problem is where are we now, given the structure of the case? Yes. And the real prejudice here, or at least what presumably came from the prosecutor's closing argument, and I'm not exactly sure how an instruction would have affected that. Well, the prosecutor in those three or four pages said four different times that this child's testimony was uncontroverted. He says there is no evidence controverting this statement by Garrick. He made a big deal out of this. And that we can't tell how big a deal that was in the eyes of the jury. But here's how an instruction could have diffused that. But the issue we have before us isn't whether he should have. I mean, I would have thought the question would be he should have objected to that argument. But that's not the way the case is structured at this point. Didn't happen either. No. What he didn't do was get an instruction from the judge that would have said, Your Honor, ladies and gentlemen of the jury, the testimony of the child is hearsay. It can only be ‑‑ it was admitted for a limited purpose. It was admitted to show the state of mind of the witness on how he knew the gun was there before it was pulled by the defendant. And may not be used for any other evidentiary purpose. You may not consider it as to the defendant's guilt, premeditation, or intent to kill. You can only consider it for the state of mind of the witness. That would have made a tremendous difference. And the notion. Even if everything that the prosecutor said came in? Yeah. I mean, in other words, you have to assume that because there's no or do you, that we're not arguing that the ‑‑ we're not assuming that the prosecutor wouldn't have said what he said anyway. We're just assuming that there would have been a limiting instruction. Well, no. Then the prosecutor could not have argued that this was uncontroverted evidence because it's not evidence. It's simply to show the state of mind of the witness. And that makes a difference. Now, remember, you're reviewing a district court decision denying a writ of habeas corpus. What did the district court rule? The district court ruled that this decision not to seek a limiting instruction was a reasonable tactical decision so as not to emphasize the devastating testimony. Well, it became devastating not because of the absence of the limiting instruction, opening the door to the prosecutor using it for the very devastating purposes that Judge Larson thought this was designed to avoid. Isn't the other problem that the lawyer here did try to say something to the judge at the time this stuff came in, and he wasn't allowed to say anything? We don't even know whether he would have tried to get a limiting instruction. He wasn't allowed to open his mouth, basically. Well, the time for asking for limiting instructions was at the time slated later on. Not then. Later on, exactly. So the confluence of the door being opened wider than it should have, the absence of a request for a limiting instruction, the argument of the prosecutor emphasizing the testimony that was supposed to be deemphasized by the tactical decision here, which just makes it strange that the district court could find that that was the the that this was a reasonable tactic. So there was ineffective assistance of counsel and there was prejudice. And it's exacerbated by the instructional problem. Look, the jury came out and didn't ask for rereading of instructions. It came out and said, we need amplification on the definition of first degree murder containing the phrase express malice. Does this exclude implied malice? Defense counsel got a call but never got to the courthouse. And instead, the judge said, reread the instructions. Now, on a lot of levels, that was the wrong answer. And it was also wrong because counsel was not allowed to enter the room. Your Honor, in France, which was a Feretta case, the defendant was excluded from a mid-deliberation instructional conference. And this Court held, in an opinion written by Judge Berzon, with a concurring opinion by Judge Kaczynski, that, and this is at, let me give you the site. It's France v. Hazen. No, I do know that. You do know the case. Okay, good. But you might give me the site. Yes. 2008, U.S. App, Lexis, 1191, Judge Thompson. Thank you. It was decided two days ago. Okay. And at star 47 and 48 of the decision, the majority says, because of the delicate nature of such mid-deliberation inquiries, we have recognized that defendants or their attorneys have a due process right to be present in conferences when either juror notes are discussed or when a trial court prepares a supplemental instruction to be read to a deliberating jury. And Judge Kaczynski, speaking for four other members of the Court, says that this is a critical stage of the pro- Four of the same members of the Court. Pardon? I said four of the same members of the Court. Yes. Part of the majority. Judge Kaczynski, supporting your decision, Your Honor, said that the supplement, the period for supplemental instruction was a critical stage of the proceedings. That goes to our argument here. We think that when the judge said If it's a critical stage of the proceedings and the lawyer is absent, what's the remedy? Is that really a due process issue or is it a chronic issue? The briefs argue it as a chronic issue and find support for that in a whole line of Sixth Circuit cases, including French v. Jones. Okay. Let's just pursue that wing of it first. Yes. If it's a chronic issue and not really a due process issue, is the remedy, is that an irrebuttable presumption then? There are two remedies. It can be viewed as structural error and, therefore, prejudice is presumed. But we don't have to get there in this case. There's prejudice here. There's substantial prejudice here. Look, the jury wanted amplification of the first-degree murder instruction. They didn't get amplification. They got re-instruction. Under Warren and McDowell, which you dissented, Judge Thompson, this court's rule is if the jury wants clarification or amplification, they're supposed to get it. They're not supposed to get a reread of the old instructions. But that doesn't go to the question of whether there was harmless error. No. We need to reach it. So I do think that becomes a central question. Yes. And here's what counsel said in his motion for new trial. Had he been present, he would have requested clarification. The following, yes, implied malice is excluded. You must find expressed malice for first-degree murder. Yeah, but isn't the real question whether these are unclear, actually unclear instructions? When reading them, they don't seem very unclear, actually. I agree. They're not unclear. To judges and lawyers, they're not unclear. That's the point, isn't it, Judge Burson? The jurors are not us. The jurors are jurors. And the jurors were confused. It wasn't clear to them. Sure, all murder by premeditated conduct with expressed malice is first-degree murder. To all of us, that's clear. To the jurors, it was mud. They asked precisely what we would view as, huh? Do they get that? The point is they didn't get that. But even aside from that, given the instructions with regard to deliberate and premeditated killing, you necessarily subsume expressed malice. They would have to find the same thing anyway. Well, that's where these two errors converge. The key evidence, the key direct evidence on premeditation is the child saying, intend to kill, he intended to kill Tom. It washes out the other. So here's my question, which I think becomes really central, which is if we do think it matters whether it's structural or harmless error, A, which is it, and B, how does AEDPA feed into that? How does AEDPA feed into that? That is, is there a clearly established Supreme Court law, et cetera? The only acronym I use is FBI. Sorry. I know what you're talking about, though. Well, I thought we were past that at this stage. The district court got to the merits. The State courts found waiver here, but the district court explained there was no waiver. There was no waiver because the State Supreme Court decided on the merits. If the State Supreme Court decided on the merits. It's preserved. Then we have, it's preserved, but it's also under 2254 D1, no? Okay. So, but there is clearly established Supreme Court law here.  As to the error in terms of chronic. And under, well, the Sixth Circuit thinks chronic holds that it's structural error. In French v. Jones, they viewed it as that the structural error emanated from chronic. And chronic is a direct descendant of gypsum and shields and the cases that lead up to it. In law school, we talked about cranberry cases. I mean, I don't have a cranberry case, but this line of Supreme Court cases and circuit cases. We might not even be here unless the Supreme Court thought you needed cranberry cases. We had a pretty good case the first time. Let's not go there, Judge. I think that France, well, first of all, the Cal Court of Appeals in Bradford, which is cited in my 20HA letter, seemed to think it was structural error. And it found a structural error in U.S. v. gypsum. And so now, so there's gypsum, there's shields, there's chronic, there's Rogers, all coming together. But we have a bunch of cases. They seem to treat it as a due process problem for some reason. But it's similar. It's exactly the same thing, where the lawyer and the client were both not there when there were jury-type issues. And we seem to treat it as harm's error. Your Honor, at bottom, chronic states in so many words that the deprivation of counsel at a critical stage in the proceeding is structural error. No, I was one of the judges who wrote one of those opinions, which analyzed it under due process, when they were both missing. I have a hard time understanding why, if the lawyer is missing, it's structural error. But if the lawyer and the client are missing, it's due process. I think we may have made a mistake treating these as due process. First, you have to look to see whether it's chronic error. And if it's chronic error, then it doesn't matter whether it's due process. But how it can be less of an error when you have both missing than it is when only one is missing baffles me. But as I say, I was one of the ones who did that. Everybody was missing. The government wasn't there either. Yeah. And the point was... If it's chronic error, is it clear that every case of chronic error is an automatically reversal? Or is some chronic error, thank you, subject to harmless error or some kind of prejudice test? Well, structural is structural. The cases that I've read at some level, perhaps out of an abundance of caution, say even if there's not structural error, there's prejudice here, I see that applicable here. Well, certainly, I mean, it isn't true, it can't be true that every structural error leads to reversing everything. I mean, for example, if you didn't have a lawyer at sentencing, you wouldn't reverse the conviction, you'd reverse the sentencing. Okay. That's correct. Right. Because it's separable in some fashion. Well, and the government relies on Satterwhite for the proposition that the absence of counsel has to infect the entire proceedings. And it strikes me that when the verdict is the entire proceedings, that's what the case is all about. So that's why when Judge Kaczynski says in concurring in France that the giving of supplemental instructions is a critical stage, it strikes me that it's critical because it goes to the verdict, which is what the trial is all about, so it does affect the entire trial. And here we have a, it's not a perfect storm, but it's a pretty damaging confluence of rulings on the admission of the three-year-old's testimony, which is the key evidence, direct evidence on premeditation, intent to kill, and express malice, and the instruction on express malice. So those together seem to me a pretty powerful case for substantial impact on the verdict under Brecht v. Abramson. I think I'd better save the rest of my time. Well, we'll give you five minutes. Thank you. May I just say that the rest of the issues I stand on the brief unless the Court has questions. Good morning. Gregory Ott for Respondent. May it please the Court. I will address these claims in the same order they were addressed by appellant unless the Court would prefer otherwise. On the ineffective assistance question, just briefly, this was a classic reasonable tactic. Aside from the question of whether, what the effect of it was, deciding whether to request a limiting instruction is one of the classic tactics that trial counsel face now. That may have been true before the prosecutor's argument, but what about after it? Well, Judge Berzon, I think you mentioned something that I was actually going to mention as well, which is at that time counsel could have objected. The nature of the evidence as hearsay hadn't changed. It was still objectionable. I think the prosecutor's argument was objectionable on hearsay grounds. The defendant's counsel did not object and has never challenged the failure to object. But when, at the time of the initial ruling, counsel, it was reasonable for him, not having the foresight or the hindsight that we have now, to foresee this argument. But wouldn't the COA and the issue as raised encompass the failure to ask for a limiting instruction after the prosecutor's argument, before it went to the jury? In other words, it didn't say when, it just said he didn't ask for a limiting instruction. He could have asked for it after the prosecutor's argument in order to clear up the fact that everything the prosecutor said really wasn't properly before the jury. He could have, I suppose. I don't recall when the discussion of instructions transpired, whether it was after argument, before argument, and sometimes. But even if it was before argument still, I mean, if he had gone to the judge afterwards and said, now look what he's done. He's made a big deal about this thing that shouldn't have come in over this, on this, on the merits. So now I want a limiting instruction. And I think that would be within the COA and the issue as raised. No one's ever said when he should have raised it. He just should have raised it. No, I don't dispute that, Your Honor. I just meant that the failure to object to the argument on hearsay grounds was never challenged. No, no, thank you. I agree. And I agree he could have requested an instruction. I think it still is a tactical issue, and I still think that. Well, it can't be tactical after the argument to the jury. Why would it be tactical then? I mean, they've heard everything that they could hear that was damaging. And to have the judge tell them, you know, that part you shouldn't really consider as to guilt could only help at that point. He could have thought that the instruction as before would just further emphasize it. This case was not about the ‑‑ this case was about circumstantial evidence. And I think that while appellant refers to a 3-year-old incompetent child, there's a flip side to that, and that is it's a 3-year-old incompetent child, and the jury may have seen it as such, that this was a biased witness referring to a conversation with a child, and it wasn't necessarily afforded a recorded significant weight, despite the fact that the prosecutor argued. Telling them that couldn't have done any harm. Beg your pardon? The judge telling them that couldn't have done any harm. It could have emphasized it, but I think without hindsight at the time ‑‑ Let's get over that part, and what do you think the effect of not telling the jury that is? To what extent do you think that was prejudicial as to the verdict? Your Honor, I don't think it was prejudicial. I think that was pretty minimal evidence in light of all the other evidence that came in, which was evidence of Mr. Musladin's prior history of violence, his conduct on the day leading up to the shooting, his history of violence and his temper, specifically as to Pam, his stress and agitation on the day of the murder. He had purchased the gun just months before, was loaded with hollow points in an unlocked gun box under his passenger seat. Now, he said, well, I bought the gun to go gold panning with, with gold panning equipment in the back, and the gun's unlocked under the front seat. He also said it wasn't loaded, right? Beg your pardon? Didn't he also say it wasn't loaded? I don't recall if he said it wasn't loaded or if he said that I didn't have a round in the chamber. He said one or the other. But the testimony that was accepted by the State Court and cited by the Court of Appeals was that the gun was loaded. All right. Sure. But the question is whether you believe him or whether you believe the other guy is probably going to be influenced by what the overall evidence is. Right. Well, Mike Albaugh said that it was one complete motion. He pulled, shot. No cocking, no loading. I think under the circumstances, I don't recall what the evidence was, but I imagine he said there wasn't a round in the chamber. I think it would be difficult for even him to suggest that he had time to load a clip and cock the gun. Well, Pam was there, and she gave testimony too at the trial, did she not? That's correct, Your Honor. And she said, what did she say that Musladin told them? You don't have to use the bad words, but somewhat blow their heads off. Blow your heads off if you don't sign over custody of the son, Garrick. And then did she testify anything about Musladin taking the gun out of the car and shooting it, or was she already running down the alley toward the garage when that happened? As I recall, Your Honor, she began to run once she either saw or heard that there was a gun. And her testimony was, I know it was consistent insofar as it was all very fast, that he went to the car and the shooting started. I don't recall whether she testified that she actually saw the gun before she ran. Okay, so it was Mike, is that his name, the other guy? Mike Albaugh. Albaugh. So Albaugh was the principal witness as to what happened, I guess. Is that correct? He was the closest to Mr. Musladin at the time that the shooting started, I believe. And he said that Musladin took the gun out of the car, turned, fired a how many shots? Well, as soon as he pulled it out, he fired, there was certainly the one shot at Mr. Studer. There was a second shot up at the garage. But I don't recall if he fired multiple shots. At the beginning, I know that the jury found a premeditated attempt on Pam as well, independent of Mr. Studer. Okay, so it was Albaugh who said he turned and fired at least one shot and hit Studer? Yes, one fast motion. And I think Musladin also said that he hit Studer with the first shot. Yes, although he said he didn't know who the person was. He hit somebody. He hit someone, he thought he had hit someone. And then Albaugh says that Musladin walks up the driveway toward the garage, enters the garage, and fires another shot. Is that what Albaugh said? That's correct, because Pam had run out the back. So Mr. Albaugh says that he walked into the garage, pointed it at Mr. Studer's head, shot him in the head. The evidence suggested that the bullet ricocheted before it entered Mr. Studer's head. But nonetheless, that is what transpired. Does it make any difference that the defense here – well, actually, that's the other question. Go ahead. I'm sorry. Well, I – let's see, where was I? I was talking about the effect of the air. Prejudice, yes. And there was also – it's sort of hard to follow without the actual graphics, but there was a great deal of discussion of who was when where and why, the suggestion being that it had to be – at least the second shot had to be premeditated because he had to have gone up there to shoot at him. There was no other reason he would have gone up there. There was a significant devotion of time to that question and argument. Mr. Albaugh said that, as Judge Thompson noted, that he went into the garage and pointed it at his head. And Mr. Mishladen's testimony was that I didn't go into the garage. I shot. I saw something behind the truck or a table saw or something, and I shot at it. I saw some movement. I thought they were shooting at me, something like that. He denies ever going into the garage. But Mr. Albaugh says that he did go in and pointed the gun. And one of the reasons the ricochet was discussed so much was Mr. Mishladen claimed that the fact of a ricochet supported his theory. Prosecution said it doesn't matter. It's just a poor shot. But neither here nor there, the evidence did indicate that it was a ricochet, the bullet to the head. The evidence indicated it was a ricochet? That it was a ricochet. But how much of a ricochet? I mean, whether it was just bouncing off the table or something. Whether it just didn't shoot very well when he shot wasn't so clear. Frankly, I'm not sure how much of a ricochet. I don't recall how close the ricochet point was. I think the argument in the testimony was it could have been a ricochet. The fact that it was a ricochet was not inconsistent with the fact that he went over there and shot him in the head. He just didn't do it very well. Right. And that was the prosecutor's argument as well. One of the things I wanted to touch on, and slightly moving to the presence issue, was there's been a lot of conflict. Is it a presence issue or is it a right to counsel issue? We keep getting very muddy about that in this case and others. I see it as a presence issue. Why? Because he has counsel, but. But the counsel isn't there when he's supposed to be there. I mean, can't be there. I mean, it's not that he tried to be there. There's no doubt that he was. No one seems to dispute that he was on his way over there. Right. I suppose I could see it both ways, but I've always thought of it as a presence issue. Because we seem to have some case law about presence and structural error, but we don't really about the chronic part of it. Well, chronic is a mysterious case. The chronic on its face says a denial of counsel at a critical stage, presumed error. The Supreme Court has backed off of that, and Satterwhite says when we're talking about pervasive denials, arguably it conflates presence and absence of counsel or denials of counsel as well. But, nevertheless, chronic is a more pervasive. I don't understand the difference between presence of counsel and absence of counsel. Isn't that the same thing? If you're not present, you're absent. How does it differ? Well, if you're not present, if counsel isn't present, then you didn't have counsel. I do see that. I don't know that there is a significant difference. I can't see any. I mean, if I said to you you're not here, you're not present, and you're absent. It's identical. I agree, Your Honor. I only spoke of presence because that seems to have just been the conversation as this case has moved along. But I don't know. I've always thought of it as presence just because he wasn't present, admittedly. Yeah. If it is absence at a critical stage, does that mean it's an automatic reversal? Or is there such a thing as a critical stage that doesn't affect the verdict or doesn't taint that whole trial? And wouldn't that mean it's not a critical stage? That puzzles me also. I can't see how you can say it's a critical stage, but it doesn't matter. Well, cases have gone. That's a good point. Cases have gone various ways. For instance, there's a circuit case that says, well, counsel was absent when the jury sent a question to the judge. The judge answered it. And I believe it was the judge answered it but didn't answer it substantively, though, so that's not a critical stage. But that seems totally backwards. I mean, the question here, in other words, the question is not what he actually did but what he might have done if the lawyer had been there. You can't answer the question of whether it was a critical stage in hindsight as to what the judge ended up doing. In other words, the stage is the state. I mean, it's like the stage. It's an event. The event here was he had to make a decision. He had a question, and he had to decide what to do with it. That's the stage. What he then decides to do with it may go to harmless error, but I don't see how it can go to the stage. Well, I agree, although cases have said just that. Some cases have said that, well, the stage depends on what the substance of what's given, which also probably means counsel wouldn't have added much. Well, see, that seems to me to be, I mean, I could understand if you say there are critical stages, but in some cases, it's not automatically reversible. But that would make some sense. But to say what happened makes it not a critical stage. As Bruce Hunt says, that seems to be backwards. You can either have a rule that says if counsel's not present at a critical stage, it's reversible. There's a presumption, irrebuttable presumption of error. And the reason they said that, according to Cranach, was they said, well, we don't want to look at the facts of a particular case. We'll just determine if the lawyer's not there at a critical stage, it's reversed. You could say that. Or you could say, look, there are critical stages that are really critical. And in those cases, it's an automatic reversal. And there are critical stages where we look to see if there's prejudice. I agree with you that if you look at all the cases, they're all inconsistent. There's a lack of rational application. The law needs to be straightened out. And that may create an input problem. But as far as getting the constitutional right straight, and since we're supposed to answer the question of whether it was a constitutional violation first, it seems to me that we ought to decide whether critical stage means automatically reversible and whether this is a critical stage. Your Honor, I'll tell you our position. Our position is that it's not. Not a critical stage. Not that if it's a critical stage. No, no. First, is it a critical stage? If you want to say it's a critical stage, but you need prejudice, that's fine. But don't say if it's a critical stage. The first question, at least I would like to know the answer to, is it a critical stage? I.e., which means, could you do it without a lawyer and not commit error? Under this Court's precedence, no. However, there aren't Supreme Court holdings indicating that anything along these lines is a critical stage. And so under AEDPA, I'd say, no, it's not a critical stage. Well, we still have to answer the first question. Under AEDPA, the Court says, first, you say, is there a constitutional violation? Or at least that's one thing you can do under it. And then if it's a violation, is it clearly established? Those are two separate questions. And I'd like to at least figure out whether there's a constitutional violation and whether it's a critical stage. Because I think the law is somewhat unclear. And if we're going to address the problem, I mean, we can get to your second position, and we do, if it's a critical stage. Your Honor, I have a hard time admitting that something is a critical stage when I don't see, admittedly in hindsight, a great consequence to what happened. Well, a critical stage doesn't make, it may be that nothing happens at a critical stage. I mean, you could have a trial without a lawyer, and everything could have gone swimmingly. The defendant could even get acquitted. But the trial would be a critical stage. There may have been no harm to not having a lawyer, but it's still a critical stage. Correct, Your Honor. So it really doesn't matter what happened. The question is, is it a critical stage when a jury asks for an instruction or a clarification? Well, perhaps one way to look at it under the various cases is that it's a critical stage, but it's never subject to structural error. Well, that's the next question. But it has to be. It seems to me that it has to be a critical stage, and I would doubt whether it's an improper problem. I mean, suppose the judge had, you know, while the lawyer is running over there, told the jury, no, you don't need express malice for first-degree murder. Suppose you told them that. If you're asking whether I would call that a critical stage, yes, I would. But then, again, the stage is not what he does. The stage is, was it subject to something like that happening? Yes. There was a question, and he was supposed to answer it, and he could have answered it in an extremely prejudicial way. Well, I think some of the way some courts may see it is that what the court did is something that was tantamount to something that was done with counsel. In other words, referring a jury back to instructions or rereading instructions was something tantamount to what was done when counsel were in the room before, and it's simply a repetition of that. Well, I mean, that would make some sense to me with regard to simply rereading the instructions, although even that, as I recall in Fisher v. Roe, we basically said no. Again, looking at it as a presence error for some reason, but that's what we did. But given that, given Fisher v. Roe, which basically said that, as I remember, that the reread was itself a critical stage, for presence purposes anyway, I don't see how it could not be a critical stage. And then you get to the next question, is it structural error? What is your view of how AEDPA feeds into this in this case? Do you understand? Well, before we get to AEDPA, your second question was, is there such a thing as structural error without automatic reversal? Can you have a structural error which then is subject to the ordinary prejudice test? I don't believe so, Your Honor. I have always understood structural error as to the part of which it is structural, be it sentencing or the trial or prelim, that prejudice is presumed. Well, maybe the question isn't being put right, i.e., is chronic always structural error? I've always assumed chronic is. I don't think chronic applies here, but I've always assumed that it is. But the only reason it wouldn't apply is if it weren't a critical stage. So basically your argument is it's not a critical stage, but if there's a critical stage, chronic applies and it's structural error. I don't think chronic can be taken at face value. I see my time's up, but if I could just answer. We'll let you know when you're done. Keep going. Okay. Thank you. I don't think it can be taken at face value. Chronic says on its face denial of counsel at a critical stage or absence of counsel, I can't remember which, is subject to presumption of prejudice. However, the Supreme Court has clearly backed off of that insofar as it should be taken literally. The Satterweight states that those sorts of situations are pervasive denials, and arguably anything that happens during a trial is going to go to the verdict. So it's not simply whether it goes to the verdict. It's a pervasive, enduring denial. And one of the cases that we cite discusses that, albeit briefly. Ellis talks about the difference between a brief denial and a wholesale denial and distinguishes chronic on that basis. So you understand pervasive to mean sort of to be temporal on how much of the time was the lawyer not there? Certainly in part, yes, Your Honor. So that if, for example, the lawyer went out to the bathroom and something happened, you might be able to say, well, nothing really of any consequence happened during that time, so we're not going to automatically reverse. Well, I suppose you could look at other circumstances as well, but I think time is definitely a factor. I mean, that sounds somewhat plausible. I mean, the judge said, look, we're not going to wait for you, we're going on, you know, witness continue, but nothing really happened. Either that or it falls under harmlessness. But there certainly wasn't any consequence. But trial, admittedly, is a critical stage. So you'd have a technical violation if he goes to the bathroom, I suppose. But it is in no way structural. Okay. Now, since we haven't solved that problem, what do we do about AEDPA? Well, I think the confusion in the cases supports the State's decision. First of all, on the question of error, there is clearly established law. Well, let's back a minute. Do you understand AEDPA to apply here? I mean, we have this really peculiar situation where the State Supreme Court actually treated it as a waiver problem. The State Court of Appeals treated it as a waiver. And then what happened? Did the Supreme Court then ask for briefing on this or something, or what did it do then? There was a petition for review was denied. That was on direct appeal. On direct appeal, a waiver was found. He then starts on collateral review. And on collateral review, the petition raising the same claim was denied with a one-line denial, which is a denial on the merits. And as the district court found, there was no more waiver because the Supreme Court essentially decided it again and ruled on the merits and didn't find waiver implicitly. I see. So my answer is yes, the AEDPA. So now you say they weren't to AEDPA because in a Delgado kind of AEDPA, that is, AEDPA but with no reasoned decision. That's my position, Your Honor, yes, that AEDPA does apply. And on the question of error, there is clearly established law that denial of counsel at a critical stage. There's a clearly established general principle is basically what we have. But what critical stages are has not been defined by the Supreme Court and specifically nothing that's akin to this deliberations. Sure, we can say, well, it's critical, but the Supreme Court has never said that, which leaves open a lot of latitude for a state court in deciding that question to the extent that it implicitly may have said this isn't a critical stage. We don't know. But the fact that it's an open question and a general principle. We have treated, I would say, at least in very closely analogous situations in Fisher v. Rowe and in France, neither of which is directly on point, under AEDPA, very similar things as critical stages. No question, Your Honor. That's correct. This Court has. However, there are a lot of decisions out there doing various things with this type of situation. And depending on what. And any Ninth Circuit cases not treated as a critical stage, either AEDPA or not AEDPA? How about the ones that apply due process? Yeah. I'm sorry, did you say have any Ninth Circuit cases not treated as a critical stage? I'm not aware of. I'm looking at the Ninth Circuit. Berrigan Davis said it was implicitly, at least, it was a critical stage, harmless error. Ninth Circuit in Rosales Rodriguez, that was a defendant's right to presence, critical stage. I'm not aware of any that find that this is not a critical stage in the Ninth Circuit. What do you do if we did apply due process instead of saying it's a critical stage and, therefore, there's presumptive prejudice? Due process. Don't those cases which say it's a due process issue implicitly say either it's not a critical stage or say it's not automatically prejudicial? I'm sorry, I don't understand the question. You mean if we're not talking about presence of counsel? If we are talking about absence of counsel and we apply due process. Okay. Are we implicitly saying that it's not a critical stage with an automatic reversal? I don't think implicitly insofar as if the court isn't addressing it. Maybe wrongly saying, if not implicitly? Your Honor, I don't know. What would the Supreme Court, what would the guiding decision be on a due process ground? Well, due process would apply a prejudice test. Right. Which you don't do, I gather, if it's an absence at a critical stage. Well, our position is that you do apply it at a critical stage, harmless error. This Court did, and Berrigan-Davis and several other decisions have as well, and I also like that. Was Berrigan-Davis a presence case, too? Well, absence. Absence, I'm sorry. I mean absence, presence, whatever it was. Yes. Due process as opposed to an absence. It was a, I believe so. I have it here as such. I have it here, too. And it appears to be. But there are other cases. Ellis. It appears to be a counsel case, actually. Okay. I think now is time. Mr. Stetkov wants to talk, too. Sorry, Your Honor. Thank you. Thank you. Thank you. What's your view of the input problem? Well, I think the discussion with counsel gets us past the waiver. In terms of clearly established law, I guess I'm comfortable with Cronick applying here. Cronick says the complete denial of counsel at a critical stage of the trial results in the following. The court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent or prevented from assisting the accused during a critical stage in the proceeding. Okay. Well, that leaves you two questions. Does the fact that do you think that under Musallam or Edward generally or whatever the recent case was? France. No, I mean the recent Supreme Court case. Yeah. There was another one the other day. Yeah. That critical stage is enough as opposed to saying this is a critical stage where the court hasn't decided that? You're asking me, I think, whether the court has to decide this precise narrow little piece of the trial is a critical stage. Yes, that's what I'm asking. To be clearly established. You're talking to a panelist. I know. The Supreme Court told us. I get that. I get that. I guess the notion of a lesser included concept comes to mind. The trial is a critical stage. I think counsel agreed that if it affects the entire trial. But then it seems to me you get to use the sense of what is critical. The chronic acknowledges that stages in the trial are critical. I don't think you have to have a cranberry that says the mid-deliberation supplemental instruction to the jury is a critical stage. I just think that that's passing it too finely. Let's go to the next stage then. What about this Berrigan Davis case? It's a 1998 Ninth Circuit case. And it says, although it clearly is a right to counsel case. It says, although a appellate may not have had a constitutional right to be present while his lawyer discussed the note with the judge, and it was about a jury note, he did have the Sixth Amendment right to be represented by his attorney at such a conference. Then it says, in this case, counsel for appellant could have used such a conference to try and persuade the judge to respond. The judge's failure to provide that opportunity was error. Then it says, because the error implicates the defendant's constitutional rights, we may disregard it only if we deem it harmless beyond a reasonable doubt. And then it goes into a reasonable doubt discussion. Am I correct that you said counsel was present but the defendant was not? No. No. It said the counsel was not present. Not present. And it says, maybe the lawyer, maybe the appellant may not have had a constitutional right to be present, but the lawyer, but there was a Sixth Amendment problem. Well, that strikes me as a holding that that was a critical stage. Yes, it is. And then it goes into harmless error. And the failure to apply structural error to a failure to apply chronic to it. It doesn't apply structural error. But in other situations, the, well, first of all, the California courts have now considered it structural error in Bradford. I mean, that doesn't help. I mean, we're bound by our precedent, as well as whether the Supreme Court's clearly established it. I mean, I suspect. Well, then I don't want to give up on Judge Thompson on prejudice. I heard Judge Thompson say to opposing counsel, wasn't there plenty of other evidence, and emphasized, for example, the threat to blow your heads off earlier in the altercation. But I emphasized earlier, Judge Thompson, because only the wife was present then. I'm reading from the government's brief, by the way. The victim who was killed comes out later. So the threat is directly to the wife and child, not to the ultimate victim. Maybe you can transfer the premeditation. But it muddies the thing up a bit. And remember, there's a self-defense issue in the case, Judge Thompson. So that muddies it up further about whether it's expressed malice, implied malice, or no malice, whatever. And what I'm suggesting to you is the evidence that you had categorized is great, if this was a substantial evidence to support the verdict case, but not for prejudice. For prejudice, all of the evidence has to be looked at. And while there is some of that evidence, what happened in this case was the child's evidence became the hammer that nailed the premeditation and the expressed malice. And I say to you, the failure to ask for a limiting instruction under that circumstance is not a classic defense tactic. And when Mr. Ott misspoke that he didn't have the foresight and then said hindsight, foresight is exactly the point. No defense counsel who had the foresight would have failed to seek that limiting instruction. When I was a prosecutor, I argued, and this court swallowed countless times, jurors are presumed to follow the instructions. And so if the jury was instructed you can't consider it, you cannot consider this for premeditation, you cannot consider this for expressed malice, in a self-defense case where there was an instructional confusion about express and implied malice, that confluence of errors and mistakes adds up to prejudice. Forget structural error, there's prejudice on first-degree murder here. Let me ask you one question about that. Does it make any difference with regard to either of the prejudice analyses, assuming we have prejudice analyses as to both these issues, that the defense wasn't really, well, not it wasn't really, it wasn't a second-degree murder defense. The defense was explicitly and only this imperfect self-defense which would have been voluntary manslaughter. And the defendant made no, the whole case strikes me as frankly incredibly badly tried for other reasons, which is that he never made a basic second-degree murder defense, i.e., you know, I was really upset and I didn't premeditate and I just shot these people because I was so upset. Everything that was going on, that was not the defense. Well, but Judge Berzon, there were second-degree murder instructions given to the jury. I know that, but I thought the jury was being focused on it. I get that, but look, there was, the self-defense argument was on two levels, it was perfect and imperfect. Right. It was devolved through the appeal and habeas process that the imperfect was stronger than the perfect, but it was still. But the imperfect was still a voluntary manslaughter argument. Correct. It was never an argument of, and looking at the closing argument, he gets up, he says, our defense is, and that was his defense, there wasn't another defense. But doesn't that go to the instructional error in the case, Your Honor? I mean, look, the instructional error was about whether it's expressed or implied malice. If it's expressed malice, it's first-degree murder, which is what the. But his argument was it was neither, so it was really not very important. His argument was it was neither, it was neither expressed nor implied malice because it was voluntary manslaughter. Your Honor, the jury had a problem with implied malice. That's what's important on the prejudice. How the case was tried, look how the jury received it. We're talking about whether there's prejudice to the verdict. The jury somehow distilled there was an implied malice question here. Judge Berzon, come on, that's why this is here. That's why you're struggling with it, because the jury had the problem. I'm not frustrated. I'm enjoying this, actually. Is this a pro bono case? No, I'm getting paid $90 an hour. CJA. $500 discount. I think that if you look at the thrust of what I've been saying to you this morning, it is not that you have, that you need to walk this case out the door. It is that this case was mistried, as Judge Berzon explained, and that there are two errors that say, look, the rough justice here is this should not, this is not a first degree life term premeditated intent to kill case as the case evolved. Is there substantial evidence to support that, Judge Thompson? Yes. But with all this mess that's in the case, no. And I think that the test is whether the verdict was significantly affected, applies here, because of the confluence of the two errors. And with that, I submit the case. Thank you, counsel.
judges: Reinhardt, Thompson, Berzon